So the first case on our call of the docket today, Tuesday, September 18, 2012, is Agenda Number 13, Consolidated Cases 113107 and 113128, Center Partners LTD et al., Applebee's v. Growth Head GP LLC et al. Appellants. So I'm sure the students have figured out all those acronyms. Thank you very much, Counsel, for the appellants. Mr. Chief Justice, Justices of the Supreme Court, my fellow Loyola Law School colleague, classmate and friend and colleague for over 50 years, may it please the Court. My name is Gino DeVito. I represent the Westfield entities in this case. And with the permission of Rouse G.G.P., I am speaking on their behalf as well. Seated at the Council table with me are my colleague Brian Hausman, Mr. John Kiernan from Double Voice and Plimpton, and Claudia Rostad from Grippo and Eldon on behalf of Rouse. Mr. DeVito, your time is up. I know that took a long time. Until this case, the courts of this state had developed a very sound principle relating to subject matter waiver. That principle had been that when a client intentionally or voluntarily discloses or puts into issue privileged information in the context of litigation, the privilege is narrowly weighed as to the disclosed information, but not as to undisclosed information. The courts have emphasized that there is no blanket waiver by partial disclosure. This case has arguably one of the elements I have just given concerning that general principle, voluntary, intentional waiver of the attorney-client privilege. It lacks the other two elements in the context of litigation and narrow waiver of attorney-client privilege information. The premise of that principle has been captured by the sword-and-effect analogy that when a party, when a client in litigation partially discloses attorney-client privilege, he or she cannot rely on the attorney-client privilege once he or she has used it as a sword, cannot rely on the attorney-client privilege as a shield. So in the common, in cases where the in-litigation waiver occurs, cases such as legal malpractice where the client may say, my lawyer told me it was okay to do this, that constitutes a waiver of the attorney-client privilege relating to what advice that lawyer gave in connection with it's okay to do this. In the context of a criminal case when a defendant claims that his attorney was ineffective in his representation because he didn't act on information that I gave him or he told me it was okay to do a certain act, that opens the door for inquiry concerning what else the lawyer told the client on that topic so that the sword used by the client in explaining the cause of action, the defense, the theory, is not used as a shield, the shield of attorney-client privilege. Mr. DeVito, you mentioned that this is in litigation. Is this case considered in litigation? The case is now in litigation. Justice Burke, at the time of these conversations, these business negotiations, there was no litigation and none anticipated. As a matter of fact, the appellate court opinion specifically says that. In denying the work product privilege, the appellate court specifically said there was no litigation. So this case clearly falls outside the ambit of the well-accepted rule here concerning in litigation and outside the ambit of virtually every case that has addressed this issue. In the cases I've described, and by the way, this comes up in the case of Sienta, too, where a defendant, a criminal defendant says, my lawyer told me that it was okay to do this act. Okay, that allows the prosecutor to call the lawyer to determine whether or not, in fact, the lawyer said that, what advice the lawyer may have given on that particular issue. But in all of these cases, the court wisely held and continues to hold that the privilege has been waived because in litigation, the partial disclosure of privileged communications threatens the truth-seeking function. That's the basis for the waiver. But the waiver extends no further than the subject matter concerning which testimony has been given by the client. What I've just informed the court is a direct quote from People v. Gerald, the seminal case, 1914 Supreme Court decision, which in dicta addresses this because that case was reversed for other reasons. The defendant was prosecuted by a former lawyer who represented him. Would a broader application of the rule assist in getting to the truth, though? Well, getting to the truth, of course, is not a reason, as this court has said frequently and as the appellate court has said, for waiving the attorney-client privilege. Relevance is not a reason for waiving the attorney-client privilege. Making it easier for counsel is not a reason for doing so, for waiving the attorney-client privilege for a broad expansion of the subject matter waiver. So the answer, Justice Garment, is absolutely not. How much should the facts or do the facts of this case play into the decision we have to make? You know, they really are irrelevant because there was no invocation in litigation. So, you know, looking at the facts and determining their probative value within this litigation, insofar as attorney advice is concerned, is irrelevant to the cause of action. What the attorneys told the clients has no connection to the cause of action. If the defendants acted in a wrongful way, that on its own will determine the cause of action. That is not what the attorneys said. Attorneys, as experts, are not permitted to give opinions as to the law. Why in this case is it relevant? What advice the attorney gave in a business transaction not related to litigation? No sword and shield consideration. So, Mr. DeVita, what rationale is there? Is it your position that certain subject matter can be given to third parties in a business transaction, and it obviously is your position, and preserve the attorney-client privilege as to that subject matter? I mean, could you say the same thing to three different third parties, four different, and still say, hey, we still have a privilege here? Or is there at some point in time when the actual focus of the conversation becomes discussions between the attorney? Is it just a waiver of that protective right? Justice Thomas, it is a waiver of what the attorney says at that time. If the common interest doctrine is not triggered, in this case, I think a strong argument could be made for the fact that the common interest doctrine should have been applied. But, unfortunately, that's not our factual scenario. So, as far as that third party, there's no privilege that attaches to what was actually said to that third party, but it stops there and you can't go into the subject matter? Precisely. The subject matter waiver, which fits so well within the context of litigation because of the sword and shield, because of the truth-seeking process where partial disclosure should not be permitted, the other side should be able to fully develop these matters. And in this case, not only has a subject matter waiver been applied, but more broadly than any case I am aware of, 1,500 documents. We're not talking about 1,500 pieces of paper. We're talking about 1,500 documents. 279 documents of Rouse. Almost 1,800 documents. So numerous that the circuit court asked that they be put on disks so that they wouldn't be in boxes in his chambers. Subject matter waiver on everything related to the purchase from Rodarko. And I know I've mispronounced that name. Rodarko. In the interest of time, the circuit court relied on two cases. Those cases were in Ray Decker, which had nothing to do with this issue. That's a crime fraud exception. Absolutely nothing to do with it. And by the way, that case is cited with the same pin, the same page number, referred to by the circuit court for the proposition that revealing a privileged information to a third person waives the privilege. The case has nothing to do with that. The other case relied upon by the circuit court is People v. O'Banner, which is an ineffective assistance of counsel case where a mother and a son said to the defense attorney, the son killed his father, the mother's husband. And the lawyer did nothing. And the son was willing to say that during trial. The mother was willing to say that. The lawyer did nothing concerning that information. Allegation of ineffective assistance of counsel, the lawyer didn't testify. The lawyer wasn't called by the prosecutor. In that context, the appellate court said the lawyer could have been called by the prosecutor to complete the disclosure, to explain the allegations made by the mother, by the mother defendant. That's what O'Banner is all about. Clearly a case in the context of litigation. Things got, and by the way, you'll note that in the circuit court's original order, there is no mention whatsoever of in-camera review. None. In the supplemental order on denial of reconsideration, the circuit court says, quote, following an in-camera review of several documents related to acquisition structure, this court ordered the production of all of the documents. The court understood the difference between several and all when you consider that statement in context. I found it interesting in reading the appellate court decision that the appellate court said that the circuit court reviewed some of the documents. I thought that's strange. I thought it was always a given that the circuit judge would have reviewed all of the documents. That, after all, is the reason. I'm sorry. Whose burden of proof is this? Assuming that we agree with the circuit court that a distinction exists between judicial and extrajudicial disclosure, what should happen next? Should this case be remanded to determine which document individually and separately would fall within one category or the other? That is our plan B, Justice Freeman. We strongly encourage this court to hold that within the context of business litigation, not in litigation, that subject matter waiver, even narrow subject matter waiver, and certainly the kind of broad subject matter waiver that was imposed here, should not be imposed. And, you know, there's reasons for that. One of the outrageous aspects of the appellate court decision and the circuit court decision is that neither of those courts considered the wealth of citations that we provided it concerning extrajudicial waivers of attorney-client privilege. The leading case, the seminal case, Inouye von Bülow, the Second Circuit case, where von Bülow, you may recall, was tried and acquitted on the second trial of murdering his wife, represented by Dershowitz from Harvard Law School, who wrote a book concerning the trial, the appeal, and so forth, and cited numerous attorney-client privileged conversations. The Second Circuit held that those were extrajudicial statements, not in the context of litigation, and there was no subject matter waiver. There was no ability on the part of the heirs of the murdered wife to seek additional attorney-client privileged information. The First Circuit decision, and by the way, these are the two leading cases in the country on this topic. The First Circuit decision Let me ask you a question, Mr. DeVito, just to clarify in my mind once you responded to Justice Freeman's inquiry about what happens. Your position A is these are not related to litigation. They were during the course of business dealings. Is that correct? Yes. And it's your position that any disclosure made during that course of those dealings can be made without getting into the entire subject matter. Does it matter for what purpose they're made? If it's to create an advantage in the business dealings, do we get into that type of thing, or is that just an absolute bore? No. It makes no difference what the purpose in extrajudicial disclosure was. And the difference in the litigation is because it can create an advantage by partial disclosure during the course of litigation that would interfere with the truth-seeking process. Precisely. And, Justice Carmar, you reminded me that I didn't fully respond to Justice Freeman's question. And the answer is yes, that if Your Honor agrees that this extrajudicial waiver is no different from that which occurs within litigation, which I trust and hope you will not determine, it would be the first case in the country from a Supreme Court or an appellate court, for that matter, so holding. In that case, then, if there is a remand, then a proper in-camera review should occur. But, you know, it's interesting to note that this in-camera review, the court relied on the Supreme Court decision I referred to before, the crime-fraud exception. That case has language, too, about in-camera review and the need for some evidentiary basis for conducting an in-camera review. So the proper method of proceeding in a case such as this is whether or not, indeed, the extrajudicial statements do trigger a subject matter waiver. And if the answer to that, and as Your Honor, I think, properly phrased the question, if your answer to that is yes, then we may be into an in-camera review situation. But if the answer is no, there's no need for it. There's no question in this case that these documents were protected by attorney-client privilege. It's a given in the case, every one of the documents. How in heaven's name, I see my time is up, may I just finish the sentence? How in heaven's name did the plaintiffs choose 1,500 documents from Westfield, 279 documents from Rouse, and score perfectly, 100% accuracy, that the judge who read some of the matters in camera was absolutely, the plaintiffs were absolutely right in selecting these documents because they all fit the broad subject matter waiver that the judge imposed. That's unthinkable. And you know from reading the briefs that clearly some things were beyond the subject matter of the disclosures. Thank you very much for your toleration. Thank you. Counsel for the appellee. Please, the court. Kevin Ford on behalf of the appellees. Mr. DeVito. Well, Mr. DeVito correctly stated that we have been friends and we were classmates 50 years ago. We took evidence together. One of us wasn't listening. And one thing that was stressed about when we talked about the attorney-client privilege is that you desire secrecy or you don't. That's the heart of it. Particularly when you put it in the framework of Illinois law, and this court has said a number of times, probably most recently in Justice Freeman's opinion in Waste Management, this is about the truth-seeking functions of the court. The attorney-client privilege in general is an obstacle to the truth. So if somebody doesn't want secrecy and they waive the attorney-client privilege, why should you limit that waiver to waivers that happen in judicial proceedings? Why wouldn't it apply just as well in some other context? What difference does it make if a client waives the attorney-client privilege by giving up the secrecy in a court proceeding, in a business negotiation, or at a cocktail party? The secrecy is gone. The cat is out of the bag. It's particularly interesting, Justice Carmeier's question about, don't want to mischaracterize it, but getting to the point of using the privilege in business negotiations. The whole idea here, in business negotiations, that's an adversary proceeding also. And why would it be acceptable to the legal profession and to this court to adopt a policy that says it's okay to use half-truths in business negotiations, just so long as you don't bring it to the courthouse? And that's basically — Mr. Gordon, is there some suggestion in this case, in the facts in this case, that that is what took place? Is there some suggestion that this advice of counsel defense was raised, or you seem to be arguing that the facts show some misrepresentation. Well, our position, first of all, is it doesn't matter. The privilege is gone. That information is available for discovery because the client no longer desired that subject matter to be secret. But in this case, they are using it. I think that's your question. They are using it in the litigation. Witnesses have testified. When they're asked about this transaction and about this synthetic partnership, which is the heart of this controversy, they say, our lawyers told us it was okay. In other words, how could you possibly get around your contractual obligations and your fiduciary duties that are in this other document by the subsequent deal that you negotiated, the three of you negotiated, leaving us out of it? And the answer is our attorneys said that's all right. And that information is going to come before a jury. And we know from the documents that we've received, we know that one of the law firms that was involved, Skadden Arps New York office, had problems. The documents say they had problems with this process. Well, that much is revealed. Why don't we get the rest of the story? I mean, that's the so it seems to me so fundamental that document, you have to the whole subject matter has to be open there to find out what the lawyers told them. That's what would happen in the context of these criminal cases that Mr. DeVito referred to. How do you address the support? How do you address the bar groups, the bar association, the amicus that basically say that the appellate court, if we if we affirm that the sky is falling for lack of. I'm trying to think of a polite response. Well, I thought the argument was absurd. And I'll tell you why. And in the end, the particular I was particularly offended by the argument by the by the I.S.P.A.'s discussion of the ethics problems, which have absolutely nothing to do with this case. This was all this all this disclosure was with clients consent. But let me I'm getting getting away from your question. What the sky is falling is this. What they're saying is if you allow if you allow waiver to apply subject matter waiver to apply a business negotiations, lawyers will be afraid that they that they can't disclose information because it may be used again someday later in court. I mean, I guess that's their point. Or they own they won't be insecure in in in their negotiations because they'll be concerned about waiving the privilege. Well, the answer to that is very, very clear. You don't waive the privilege, whether you are in a courtroom or in a deposition at a cocktail party or in business negotiations. If if there if there is something that you want to keep to keep secret, keep secret. The fact of the matter is what they what they suggest is exactly the opposite. And I'll try to give you an example. They say you have to go through this fairness balancing and make a determination whether that information, whether subject matter applies after you make a waiver in a business negotiation. Well, the problem with that is it may or may not be waived. You won't know until a court later sees the entire circumstances and gets into this fairness analysis. So the way the law is now, and we believe that's the law. The law of Illinois is what the appellate court held was is consistent with the law of Illinois. And if you follow that law, it's very simple. The sky isn't going to fall. We've been following this law for a hundred years. Delaware follows it. That's Mecca for deal lawyers. Delaware follows the subject matter rule in extraneous or extrajudicial proceedings. We've cited two cases from Delaware. Her statement says that it's the majority rule. Lawyers understand. It's part of your argument. And this is going to be a question for Mr. DeVito when he gets back up here primarily. But it's part of your argument that an attorney at the business negotiation stage can preserve a sword for the litigation stage by saying something that they know could come out, perhaps through a third party, and then keeping the rest of the conversation privileged? I'm not sure I understand it. Mr. DeVito started by saying, you know, at litigation you can't use something as a sword and a shield, right? That's the reason for the subject matter privilege, right? So in this particular case, if you have a business negotiation, right, and something is said to a third party as to what a lawyer had said, you know, for a third party, which wouldn't be privileged because it was said, but the subject matter under Mr. DeVito's argument would be privileged, right? My question is, could you be using it as a sword and a shield, knowing that whatever this business negotiation that's going on may result in litigation and therefore get out what you want out but keep out what you don't want in? I think that's a genuine risk, and in fact, you know, in some respects that happened here. But that is a risk of that rule. And that goes to Justice Tice's question. Does it have to happen here? Do we have to have some type of do we have to do some fact finding to find out if that's exactly what was going on, that there was litigation discussed or in the offing and that's what was done, or don't we need those facts? I don't think you need those facts. No, I think there's been a waiver, and it's as simple as that. There's no doubting Mr. DeVito has conceded there was a waiver. Did I misunderstand you? You were talking earlier about opening this up and saying essentially our lawyers told us to do it this way. Is that what you're saying is the tactical advantage that they attempted to get into litigation? Yes. So it's not strictly the business aspect of it. That's correct, Your Honor. And you asked a question earlier regarding the facts, and Mr. DeVito said the facts are irrelevant. I don't think the facts are ever irrelevant. But in this case, as you'll see our discussion in the briefs, it demonstrates why the subject matter rule as we apply it works so well here. And the facts of this case, when you look at the entity that we described, Urban was a partnership and is a partnership. Urban owned some of the most important real estate in America. The three defendants decided they wanted that property. They developed this scheme, and that's what it's charged in the complaint. They developed this scheme to really appropriate that property. The only problem with the scheme in the beginning is that the contract provided certain protections. The Urban partnership contract provided certain protections that prevented it and imposed fiduciary duties on the partnership. So the buyers, the three defendants, decided they could still acquire this property if they could get around these contract provisions and these fiduciary duties. So they developed this synthetic partnership, which you won't find any reference to in any law book. They developed that synthetic partnership, and that synthetic partnership is the heart of this case. How does it work? How can this synthetic entity, whatever it is, effectively exclude prior contract rights, prior fiduciary duties, and allow these people to take these properties? Urban was once owned all these properties. All these properties now are controlled and managed by the three defendants. It's a great case of corporate blunder, and we think that the answers to those questions and the critical part of our case to prove that it was not a genuine vehicle that they used, this synthetic product, we have to get the documents to understand it. The documents say Skadden has some problems with this. We want to see what those problems were. And if that isn't the same subject matter, Skadden has some problems. All right, that subject matter is open up. What were the problems that Skadden found in that structure? And the trial court looked at two subjects. The synthetic partnership was one, reviewed the documents. Justice Freeman, they challenged a handful, and this is referred to in the appellate court opinion, a handful of documents. There's no reason for this to go back for another review by another judge. That judge is no longer on the bench, I don't believe. But anyway, the appellate court referred to the fact that there's only a handful that they challenged as being outside of the subject matter. And the simple basic solution is just what the trial court did and what the appellate court did here is apply the subject matter rule to the subjects that were opened up by the voluntary disclosures. And that should be, that has been and should be the law of Illinois. It is the law of the majority of other states. Mr. Ford? Yes. With regard to, if we agree with you that it should be disclosed, or that there's a subject matter waiver doctrine, why all the communications? Why not just the ones of a particular situation? Well, actually, of the documents that were on their log, only 37%. There's this reference that all the documents were related to this transaction that were on their privilege log. The plaintiffs identified 37% of Westfield's documents and said, these we believe fall within the subject matter. They were selected from the descriptions on the privilege logs. So they really created the subject matter identifiers, not us. I'd like to spend a moment on the new law that they would like you to adopt, and that's von Buelow. Von Buelow, if you read the decision, I would say this, Mike. Read von Buelow and think if that's the law you want for Illinois. Von Buelow, Dershowitz, as he said, and von Buelow, two egomaniacs go on television and give all the good evidence that von Buelow gave Dershowitz. And Dershowitz writes a book using all the good evidence. And then a trial comes up, and the Second Circuit says, no, no, no, you can't use the bad evidence. They only waive the privilege as to the good evidence. That's preposterous. I mean, I cannot believe that so out of touch with Wigmore and the law of Illinois and our truth-searching attitude on evidence. We cited a later case, a very recent case. We cited it because it reversed the decision. We cited it not in our briefs, but as a later authority. And in that case, as I said, I wish that it had affirmed a trial court because we were relying on a trial court. But it did explain von Buelow, and it explained the keeper of the records, another case that they rely on. And it talked about where the so-called modern trend is in some of these federal cases. And what that court said is what you do with extrajudicial waivers is you apply a fairness test, and the fairness test is that they suggest you apply. They referred to Federal Rule 502, and that rule, which it says only applies to judicial waivers, but they said you apply the same rationale. And that is the waiver was intentional. That's here. They say it was disclosed. There are other documents dealing with the same subject matter. That's admitted here. And that the disclosed and undisclosed materials ought in fairness be considered together. That's here, too. I mean, it's clearly these documents should be considered together. If you adopted the Wieland as the later case that I referred to, but if you adopted Wieland or wanted to adopt some other law, you would consider the following. The disclosure here was intentional with the knowledge of the client. The disclosed and the undisclosed materials here go to the heart of the case. I mean, these aren't periphery issues. This is the heart of the case here. They are using them offensively. They are at least alluding to them because they are going to say our lawyers told us it was okay. They knew from day one, and this gets back to a question, they knew from that conference room when they were in conference rooms because there were many meetings, they knew when they were exchanging those documents and putting this deal together, which, again, I say, was designed specifically to frustrate the rights of the plaintiffs, to get around their contract rights. They knew that that was going to be litigated, and that gets, I think, to your question, Justice Thomas. They knew that they were going to be in a courtroom someday. They had to know because the stakes were so big. So under those circumstances, you can't separate litigation from negotiation, but I don't think you should. I think what's fair is fair, and if somebody doesn't want secrecy and won't protect the secrecy, it doesn't matter where they waive it. So I would respectfully submit that the appellate court, which certainly didn't deserve the attack it received in the PLA here, that law in the appellate court is consistent with the teachings of this court on the subject, but even if you disagree with the interpretation, under all of the facts here, you should still affirm because they are using it offensively in the litigation. Thank you very much for your attention. One question, Mr. Ford. If you said something to the effect that they would testify or they would say they relied on lawyers' advice in doing something or other, does that open up the box, just saying I relied on lawyers' advice? Does that mean there's disclosure of confidential information? Well, so far, because they were cut off in depositions, one of the problems there was we're coming up on a discovery issue, and so they have such a small part of the record. But when asked the question, two different witnesses in different ways, when asked the question, what made you think you could do this, take these properties away, not do future developments through the existing partnership, what made you think you could do that without breaching your fiduciary duties or breaching the contract rights of the original partnership, the answer was our lawyers. This whole thing was a creature of lawyers. I mean, these business people didn't put this synthetic partnership thing together. This was a real creature of a lawyer's imagination. Thank you, Mr. Ford. Thank you. Mr. DeVito. It's important, first of all, to respond to this allegation that the witness relied upon the advice of counsel. When your honors have an opportunity to review the record on this, you will note that throughout that deposition of the CFO of Westfield, which is what Mr. Ford has been referring to, there was a constant invocation of the attorney-client privilege over and over again, and a recognition by plaintiff's counsel that the attorney-client privilege was being invoked, and a respect for it, and incessant questioning, notwithstanding that, as to the basis of the position. One short phrase was advice of counsel. Within the framework of all of this invocation of attorney-client privilege. Note that in this case, no court, circuit court, appellate court, has relied upon that as a basis for waiver, invocation in litigation. That is not a basis for the appellate court's decision or the circuit court's opinion. It's sort of a throwaway argument that they make, which cannot stand up on close scrutiny. There was no invocation of the attorney's advice. Not only that, your honors, note that Westfield has categorically, specifically, stated that it will not invoke attorney advice. So these issues are out of this case. This case is about subject matter waiver on extrajudicial statements. In the context of business negotiations. Plaintiffs talk about a way to get around this problem, and as a matter of fact, they defended our argument, you know, what's good for the goose is good for the gander. Judge, we said at the circuit court level, if you're going to rule that we have to turn over documents to them, privileged documents, undisclosed documents, because of what was said during negotiations, then what about the plaintiff's disclosures during their discussions with Radamco and others? We should be entitled to that. Well, their response is, well, it could be phrased differently. Instead of talking about attorney advice, you can use words like legal positions, implications, legal views, legal issues, legal evaluation. How in heaven's name do we get there? How do we separate those terms from legal advice? We're going to be mired in debate, discussion in courtrooms regarding obtaining discovery, admissibility of evidence concerning these semantic terms. They have relied in the affidavits which they have supplied to counter our effort to get their attorney, client, privileged information if we were ordered to give ours, an issue that the court ignored, wasn't even aware of when it was brought to his attention on rehearing. What's to prevent, Mr. DeVito, in your words, a sword and shield situation from arising with an attorney during business negotiations knowing that those negotiations aren't going anywhere and setting something up for the shield sword at the litigation itself? Your Honor, the first test, of course, that would have to be met in such a case would be the issue of relevancy. We're talking about the potential hearsay here as well, so that the fact that the lawyers said it during these discussions is really of no moment. It shouldn't be admitted. Their search is to get all this undisclosed information. Let me stop you there. Are you saying that can be handled by just not letting the sword aspect in, whatever the attorney had said at negotiations? Yes, that is one possibility. But this broad waiver of even undisclosed and unrelated matters without a doubt that occurred in this case just should not be accepted by this court. Mr. Ford says, why the difference? Well, you know, Von Bolo and XYZ Corporation tell us why the difference. Von Bolo, virtually every reported instance of an implied waiver extending to an entire subject matter involves a judicial disclosure. That is a disclosure made in the course of a judicial proceeding. XYZ, I'm sorry, I just quoted XYZ. Von Bolo, there exists no reason in logic or equity to broaden the waiver beyond those matters actually revealed. So long as such disclosures are and remain extrajudicial, there is no legal precedent, I'm sorry, no legal prejudice that warrants a broad court imposed subject matter waiver. The reason is that disclosures made in public rather than in court, even if selective, create no risk of legal prejudice. Until put at issue in the litigation by the privilege holder. What your honors have to be concerned about is legal prejudice, not the stuff that's being said out there. Counsel has told you that Von Bolo and Dershowitz were on programs, I think, before the retrial. I don't think that's true. It was done after the second trial, after the acquittal. And the fact that they're using this stuff to promote a book triggers the ability to get attorney-client privilege. The court should not countenance that. There's absolutely no connection between the two. It has nothing to do with our truth-searching interests that in some way in public even people abuse these things. What else should I respond to? Counsel tells you that they only chose 37 percent of the documents. Well, they hit a grand slam homer on those 37 percent. And documents that we know from the circuit court's own statements that he reviewed several. Can you see him sitting at the computer reading all of these documents on the disks and not saying a word about them? Not a word in either opinion. A hundred percent are turned over. Talk about broad subject matter disclosure. This case is the epitome of that. Minimally, you know, we've argued, and we do mean it, that there should be no subject matter waiver. But minimally, this court should abide by what all the courts in Illinois have said regarding subject matter waiver in the context of litigation, that the waiver is very narrow, extraordinarily narrow. The cases that we deal with involve the turning over of a document or two, not the many documents that have been turned over. I see my time has expired. Thank you very much. Thank you. Mr. DeVito, Mr. Ford, we thank you for your arguments today. Case number is 113107, consolidated with 113128. Center partners LTD at all. Appellees versus Growth Head GP, LLC at all. Appellants is taken under advisement as agenda number 13.